IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TIMMY M. WENBURG, | |
| Plaintiff, | 4:11-CV-3134 |
| vs. | |
| MICHAEL J. ASTRUE, Commissioner of the Social Security Administration, | MEMORANDUM AND ORDER |
| Defendant. | |

This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff's disability insurance benefits under Title II of the Social Security Act ("SSA"). 42 U.S.C. § 401 *et seq*. The Court has carefully considered the transcript of the administrative record (filings 12 and 13) and the parties' briefs (filings 16 and 18). For the reasons discussed below, the Commissioner's decision will be affirmed.

## I. PROCEDURAL BACKGROUND

The plaintiff, Timmy M. Wenburg, filed for disability benefits on September 22, 2008. (Tr. 134–35.) Wenburg alleged disability due to diabetes, the removal of his right toe, clinical depression, and Asperger's syndrome. (Tr. 175.) Wenburg was born in 1962. (Tr. 134.) He alleged that he had been disabled, and unable to perform substantial gainful activity, since June 24, 2008. (Tr. 134.) Wenburg's application was denied initially (Tr. 59, 69–72), and on reconsideration (Tr. 65, 75–78.) On May 27, 2010, following a hearing, the administrative law judge (ALJ) found that Wenburg was not disabled as defined under sections 216(i) and 223(d) of the SSA,[1] and therefore not entitled to disability benefits. (Tr. 13–23.) The ALJ determined that, although Wenburg suffered from several severe impairments, and could no longer perform his past relevant work, he had the residual functional capacity to perform other jobs that exist in significant numbers in the national economy. On June 14, 2011, the Appeals Council of the Social

---

[1] 42 U.S.C.A. §§ 416(i), 423(d).

Security Administration denied Wenburg's request for review of the ALJ's decision (Tr. 1–4).

Wenburg's complaint seeks review of the ALJ's decision as the "final decision" of the Commissioner under sentence four of 42 U.S.C. § 405(g). Wenburg claims the ALJ erred by failing to include in the hypotheticals to the vocational expert ("VE") the impact of Wenburg's "moderate difficulties relating to concentration, persistence[,] and pace" and by failing to "orient the VE to the totality of [Wenburg's] limitations." Filing 16, at 3–4. Wenburg claims that as a result of these errors, the ALJ's decision was not supported by substantial evidence.

For the following reasons, the Court concludes that the ALJ did not err in the choice of hypotheticals to the VE. The Court therefore finds that the Commissioner's decision is supported by substantial evidence and should be affirmed.

## II. FACTUAL BACKGROUND
### A.   Medical Records

Wenburg suffers from numerous physical and mental ailments. However, Wenburg assigns error to the ALJ's decision only as it relates to his mental impairments. The Court will fully discuss the record relating to Wenburg's mental impairments, but will address his physical impairments more succinctly.

When he was 13, Wenburg was diagnosed with Type I, juvenile onset diabetes and he has been insulin-dependent since that time. (Tr. 250, 326, 405.) Wenburg's hip was pinned in 1995 following a fracture he received while practicing martial arts. (Tr. 250, 326.) From approximately 1997 to 2006, he was employed with Tyson Foods, where he washed and cleaned equipment. (Tr. 36–37, 347.) In early 2006, this work was automated and Wenburg's job was eventually phased out, although he continued to work for Tyson. (Tr. 36–37, 347.)

In May 2006, Wenburg visited Dr. Mark Jones, a general physician, complaining of insomnia, anxiety, and depression. (Tr. 339.) Wenburg reported that he was mildly depressed and anxious about his job change. (Tr. 339.) In several follow-up visits over the next 2 months, Wenburg stated he was still anxious about his job change, but that he was sleeping well. (Tr. 341, 343, 345.) In these follow-ups, he reported he was anxious, but did not report that he was depressed. (Tr. 341, 343, 345.)

On September 4, 2006, Wenburg was transferred to the position of "cattle strainer" at Tyson, and the stress of this led him to voluntarily admit himself to Richard H. Young Hospital on September 14, 2006, because of thoughts of suicide. (Tr. 232.) Wenburg described the new position as very

2

stressful, for several reasons: he was working with slaughtering cattle and it was "much more filthy;" he was having trouble getting along with his new coworkers; and he was unable to get away from his work to monitor his blood sugars. (Tr. 232, 347.) The stress built up and led him to feel suicidal. (Tr. 232.)

Prior to his hospitalization, Wenburg had worked for 9 years cleaning trailers, mainly working on his own and not having to interact much with others. (Tr. 405.) In his new position, he had to interact with coworkers, most of whom did not speak English. (Tr. 405.) Consequently, Wenburg had a hard time learning how to do the new job. (Tr. 405.) The new position also required him to stand in damp and often wet areas, which aggravated the diabetic ulcers on his foot. (Tr. 405.) Wenburg stated that he "had a lot of anger at his employer" because, as he explained, "'I can go back to Tyson's, but I can't get my old job back because they automated it, and I can't deal with the pressure of the new job there.'" (Tr. 405.) A report from Dr. Sanjoy Banik, a psychiatrist with Richard Young, dated the day after Wenburg's admission, lists Wenburg's global assessment of functioning (GAF) as 20.[2] (Tr. 232.) Wenburg ultimately stayed at Richard Young for 6 days. (Tr. 349.) This was the first time Wenburg had been hospitalized for psychiatric issues. (Tr. 232.)

A mental status exam by Dr. Greg Kloch, a physician with Plum Creek Medical Group, from September 22, 2006, after Wenburg was released from Richard Young, revealed that Wenburg was "in good spirits" and no longer had thoughts of suicide. (Tr. 347–48.) Kloch diagnosed him with "depressive disorder, not elsewhere classified." (Tr. 348.) Kloch noted that Wenburg's diabetes was without complication. (Tr. 348.) In December 2006, Wenburg met again with Jones to review his medications. (Tr. 349.) Wenburg reported that he was still suffering from depression, but that the medication was helping, and he was no longer experiencing anxiety or insomnia. (Tr. 349.)

In April 2007, Wenburg had cataract surgery on his left eye to improve diabetes-related retinopathy. (Tr. 245–50.) By the next month, he was doing well and was "getting along" with over-the-counter reading glasses for small print. (Tr. 244.)

---

[2] A GAF is "the clinician's judgment of the individual's overall level of functioning," not including impairments due to physical or environmental limitations. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000) (hereinafter, "DSM-IV-TR"). A GAF score of 11–20 indicates that the person is in some danger of hurting himself or others; occasionally fails to maintain minimal personal hygiene; or has a gross impairment in communication. *Id.* at 34.

3

In August 2007, Wenburg sought treatment for diabetic ulcerations on his right great toe. (Tr. 326–27, 335.) Wenburg's problem was exacerbated by the wet working conditions at his job, which required him to wear rubber boots and made it difficult to keep his skin dry. (Tr. 275.) On February 9, 2008, Wenburg reported to the emergency room to seek treatment for a breakdown of the skin on the bottom of his right foot and the ulceration on his right great toe, which had worsened. (Tr. 253–54, 275.) He was placed on antibiotics and sent home. (Tr. 253.) For the next 3 months, Wenburg received various treatments for the problems with his toe and for his feet in general. (Tr. 275–99.) Eventually, in June 2008, Wenburg's right great toe had to be amputated. (Tr. 261–63.) Thereafter, follow-up appointments confirmed that Wenburg's feet (and remaining toes) were doing better. (Tr. 395–402.)

From April 2007 to April 2008, the medical records show that although Wenburg was still diagnosed with depression, he was not experiencing any new difficulties with his mental health issues. (Tr. 244, 245, 248, 250, 357, 359, 362, 366–71.) However, in April 2008, during a follow-up visit to Jones regarding his amputated toe, Wenburg complained of a sudden onset of anxiety and agitation. (Tr. 372.) Jones diagnosed depressive disorder and anxiety disorder and prescribed medication. (Tr. 372.) During visits to Jones in April, May, and June 2008, Wenburg continued to report mild depression, anxiety, mood changes, and irritability. (Tr. 372, 374, 377, 379, 381, 384, 386, 388, 391.) Jones' notes from these visits, however, reveal that Wenburg's "general appearance" was "Not Anxious or Depressed." (Tr. 372, 374, 377, 379, 381, 384, 386, 388, 391.)

Beginning in July and August 2008, Wenburg no longer reported issues with anxiety or depression in his visits to Jones. (Tr. 394, 395, 396, 399.) In August 2008, Wenburg stated that he wished to return to work (Tr. 397, 399, 400), but reported that Tyson was having difficulty finding a position for him that could accommodate his restrictions. (Tr. 400.)

In November 2008, Wenburg met with Dr. Sheryl Shundoff, a clinical psychologist, for a psychological consultative examination. (Tr. 404–07.) Wenburg stated that he did not maintain contact with his siblings and described himself as "'more of a loner.'" (Tr. 404.) He reported that he was switched from a job at Tyson that he enjoyed to one that he did not like and that the new position "'had a lot of pressure.'" (Tr. 404.) Wenburg claimed that when he fractured his hip in 1995 and had to give up practicing martial arts this caused him "significant depression." (Tr. 404.) He had to move in with his parents due to medical expenses. (Tr. 404.) He explained that, "'I just feel like I'm cursed. It's like I just get things going, and something

4

happens.'" (Tr. 404.) He identified problems relating to his father (who died in 2007) and both of his brothers. (Tr. 404.)

Wenburg stated that he had been recently diagnosed with Asperger's syndrome by his therapist at Lutheran Family Services. (Tr. 405.) Wenburg described experiencing depression, as "'continual dark moods'" since at least 1998; reported thoughts of suicide; and stated that he used lancets to scrape on his arms, and that he had cut his shoulders and legs in the past, but had not done so recently. (Tr. 405.)

In her report, Shundoff observed that Wenburg's mood was depressed but that his other basic psychological indicators were normal. (Tr. 406.) Shundoff stated that he was "isolative with others and prefers to work alone" but that he wanted to find some social outlets and be able to interact with people. (Tr. 406.) She noted that in the past, in addition to practicing martial arts, he enjoyed doing karaoke, and had even joined a community theater group in order to meet people. (Tr. 406.) Shundoff diagnosed Wenburg with "Major Depression, Recurrent, (without psychosis, with past suicidal ideation," and listed his GAF as 40.[3] (Tr. 406.) She did not diagnose Wenburg with Asperger's, nor did she observe or record the typical symptoms of Asperger's. (Tr. 406, 427.) Shundoff wrote that Wenburg had no restrictions on his activities of daily living. (Tr. 407.)

In her report, Shundoff found as follows. Wenburg had the "ability to sustain [the] concentration and attention needed for task completion," but had an easier time functioning at home than at work. (Tr. 407.) He had the "ability to understand and remember short and simple instructions," and the "ability to carry out short and simple instructions under ordinary supervision," unless he was under stress. (Tr. 407.) Wenburg suffered from "recurrent episodes of deterioration when stressed which result in withdrawal from the situation or an exacerbation of symptoms." (Tr. 407.) Shundoff noted that Wenburg could not function at work when stressed and would have suicidal thoughts. (Tr. 407.) He had "difficulties in maintaining social functioning," and could not "relate appropriately to co-workers and supervisors." (Tr. 407.) He did "so-so" with supervisors, but felt he could not please them, and did not interact with his coworkers, most of whom did not speak English. (Tr. 407.) However, Shundoff found that Wenburg had the ability to adapt to changes in his environment, although it was difficult for him, and that he was capable of handling his own funds. (Tr. 407.)

---

[3] A GAF score of 31–40 indicates some impairment in reality testing or communication; or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. DSM-IV-TR at 34.

In November 2008, Dr. Linda Schmechel, a psychologist, completed a mental residual functional capacity (RFC) assessment form, as part of the state agency level determination of Wenburg's disability status. (Tr. 410–14.) The form filled out by Schmechel contained four broad categories: Understanding and Memory; Sustained Concentration and Persistence; Social Interaction; and Adaptation. (Tr. 410–11.) Each category included several more specific functional assessments. (Tr. 410–11.) Next to each of these were five checkboxes labeled: Not Significantly Limited; Moderately Limited; Markedly Limited; No Evidence of Limitation in this Category; and Not Ratable on Available Evidence. (Tr. 410–11.)

Under "Understanding and Memory," Schmechel found that Wenburg was not significantly limited in his ability to remember locations and work-like procedures, or in his ability to understand and remember very short and simple instructions, and that there was no evidence of limitation in his ability to understand and remember detailed instructions. (Tr. 410.)

Under "Sustained Concentration and Persistence," Schmechel determined that Wenburg was moderately limited in his "ability to work in coordination with or proximity to others without being distracted by them," and in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 410–11.) Schmechel reported that Wenburg had no significant limits on his ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, or be punctual. (Tr. 410.) Finally, she observed no evidence of limitation in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, or make simple work-related decisions. (Tr. 410–11.)

Under "Social Interaction," Schmechel found that Wenburg was moderately limited in his ability to interact appropriately with the general public. (Tr. 411.) She determined he was not significantly limited in his ability to ask simple questions or request assistance and to maintain socially appropriate behavior. (Tr. 411.) Schmechel reported no evidence of limitation in Wenburg's ability to accept instructions and respond appropriately to criticism from superiors, or in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 411.)

Finally, under "Adaptation" Schmechel stated that Wenburg was moderately limited in his ability to respond appropriately to changes in his work setting. (Tr. 411.)

Schmechel also completed a "psychiatric review technique" form in November 2008. (Tr. 415–427.) She assessed Wenburg under category 12.04,

6

"Affective Disorders."[4] (Tr. 415.) Under the "paragraph B" criteria, she found that Wenburg had no restrictions in his activities of daily living, had moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 425.) Schmechel noted that there was insufficient evidence to determine whether Wenburg had experienced repeated episodes of decompensation, each of extended duration. (*Id.*) She determined that the evidence did not establish the presence of any "paragraph C" criteria. (Tr. 426.)

Schmechel reviewed Shundoff's notes and Wenburg's records. (Tr. 427.) Schmechel observed that although Wenburg tended to be socially isolated, he had previously joined a community theater group as an avenue for meeting people. (*Id.*) She concluded that the medical evidence failed to substantiate his claim of autism or Asperger's syndrome. (*Id.*) Schmechel determined that Wenburg's depression imposed only "moderate limitations" on his mental RFC, and did not "markedly impair" his RFC. (*Id.*) She found that his allegations relating to his mental conditions were "only partially supported" and thus only "partially 'credible.'" (*Id.*)[5] In February 2009, separate physicians reviewed and affirmed the RFC assessments of both Schmechel and Reed, without comment. (Tr. 437, 438.)[6]

On February 10, 2009, Wenburg sought psychiatric care from the Richard Young Outpatient Clinic. (Tr. 439.) He described symptoms of panic, palpitations, chest tightening; great fear, shortness of breath, and defensive thoughts. (*Id.*) On a scale of 0 to 10, with 0 being "no significant depression" and 10 being the "worst depression one can imagine," Wenburg stated he was at "6." (*Id.*) He reported that he was working with vocational rehabilitation to find a job, but that he was worried that he might not be able to return to work, and this was causing him to think of harming himself. (Tr. 439.)

Wenburg met with Julie Klahn, APRN-C (Advanced Practice Registered Nurse, Certified). (Tr. 441.) Upon examining his mental status, she noted that Wenburg did not have any suicidal ideation, and was alert and

---

[4] See discussion, *infra*, regarding 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*.

[5] In contrast, Dr. Jerry Reed, who completed a *physical* RFC assessment in December 2008, found that Wenburg's physical allegations were reasonably attributed to his medically determinable impairments and that his allegations were generally credible. (Tr. 428, 433, 435.)

[6] The Court will refer to these opinions, collectively, as those of the "state agency medical consultants."

7

oriented. (Tr. 440.) Klahn diagnosed him with "generalized anxiety disorder, NOS [not otherwise specified]" and rated his GAF as 65.[7] (Tr. 441.)

On March 25, 2009, Wenburg again met with Klahn at the Richard Young Outpatient Clinic. (Tr. 442–43.) He reported anxiety about his job applications, the issues his counselor was addressing, and his lack of financial support for medications. (Tr. 442.) Wenburg was having trouble falling asleep, was taking his medications, and had not seen improvement in his depression or anxiety. (*Id.*) His mental status examination was more or less unchanged, and Klahn's diagnosis was the same as on the previous visit. (Tr. 442–43.)

On April 21, 2009, Wenburg met with Klahn and reported that the medications were helping him with his depression and that he had completed a job application for seasonal work with the parks. (Tr. 444–45.) His mental status examination was again relatively unchanged, but his GAF was elevated to 70. (*Id.*) Klahn again diagnosed him with generalized anxiety disorder, NOS; and, for the first time, Asperger's syndrome (Tr. 446.)

On August 5, 2009, Wenburg was admitted to Richard Young for 1 week. (Tr. 451–52.) He had been taking Zoloft for depression for 2 months, but then stopped taking it for a week. (Tr. 451.) Wenburg stated that he was unable to concentrate, was having trouble sleeping, and felt worthless and hopeless. (*Id.*) He had been taking a vocational rehabilitation class, but received a failing grade because he was unable to concentrate, which intensified his depression. (*Id.*) Dr. Hugo Gonzalez, a psychiatrist, met with Wenburg on August 5, 2009. He reported that Wenburg had scratched the word "hate" and a checkerboard pattern on his upper left arm. (Tr. 457.) Gonzalez noted that Wenburg had a history of depression and Asperger's syndrome. (Tr. 457–58.)

On August 6, 2009, Dr. Francisco Garcia, a psychiatrist, performed a psychiatric assessment of Wenburg. (Tr. 453.) Wenburg denied any active suicidal thoughts. (*Id.*) Garcia diagnosed him with "Major Depressive Disorder, Recurrent" and Asperger's syndrome, and assessed his GAF as 40.[8] (Tr. 454.) Wenburg's medications were adjusted and restarted (*Id.*), and by

---

[7] A GAF score of 61 to 70 indicates some mild symptoms; or some difficulty in social, occupational, or school functioning; but that the subject is "generally functioning pretty well, [and] has some meaningful interpersonal relationships." DSM-IV-TR, 34.

[8] A GAF score of 31–40 indicates some impairment in reality testing or communication; or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. DSM-IV-TR at 34.

August 12, 2009, Garcia noted that he exhibited significant improvement in his mood, and assessed his GAF as 60.[9] (Tr. 451.)

On April 12, 2010, Lorna Lawton, a Licensed Mental Health Practitioner with Lutheran Family Services, wrote a letter to Wenburg's attorney. (Tr. 462.) Lawton stated that she had met with Wenburg over the course of 6 years and that he had struggled with depression and anxiety throughout this period. (*Id.*) She wrote that Wenburg had major depression and Asperger's syndrome, and ruled out generalized anxiety disorder. (*Id.*) Lawton opined that Wenburg had a hard time relating to others because of his Asperger's, and that his lack of social skills made it "very hard for him to work with others." (*Id.*) She also stated that he would cut himself to find relief from emotional pain. (*Id.*) Finally, Lawton wrote that Wenburg was "not able to work around others, due to his anxiety," and that he was very anxious about "finding the right kind of job since his amputation." (*Id.*)

**B.   Hearing Testimony**

At the hearing held on April 15, 2010, the ALJ received testimony from Wenburg, his Goodwill caseworker Lissette Acosta, and the vocational expert, Judith Najarian.

**1.   Wenburg's Testimony**

In describing his work experience, from 1996 onward, Wenburg reported that his past work included cleaning machinery and floor maintenance. (Tr. 35–37.) He stated that when he was working cleaning trailers, he generally worked alone, although there were other workers on his shift. (Tr. 43–44.) Wenburg explained that after he lost his toe, he stayed off work for 6 weeks to allow healing. (Tr. 45.) When he returned to work, his employer would not put him in an area where he could avoid having to stand or be hunched over. (Tr. 45.) His employer also refused to put him in a dry area. (Tr. 45.) Wenburg filed a workers' compensation claim against his employer, which was settled. (Tr. 45.) He then resigned. (Tr. 45.) He last worked on June 24, 2008. (Tr. 37.)

Wenburg stated that he was single, lived alone in an apartment, and did not have any children. (Tr. 33.) Wenburg has completed 2 years of college. (Tr. 33–34.) In describing his activities of daily living, Wenburg reported that he performed household chores, did a little cooking, and did his own shopping. (Tr. 33-34). He did not take part in any social activities, but would visit with his mother, who lived in the area. (Tr. 33, 41.) His hobbies were collecting movies and music. (Tr. 34.)

---

[9] A GAF score of 51–60 indicates some mild symptoms; or some difficulty in social, occupational, or school functioning. DSM-IV-TR, at 34.

Wenburg testified that he had not done anything socially with anyone else, and had remained isolated, for the last 4 to 8 years. (Tr. 41.) While he was in college, he was a "pretty solitary person" who was not socially active and was picked on by other students. (Tr. 41–42.) This still made him nervous that he would be physically harmed when he heard "bumps on the wall or banging outside." (Tr. 41–42.)

Wenburg described a typical day: he would wake up between 8 and 10 a.m., check his blood sugars, take his insulin, and eat. (Tr. 35.) He would watch television and try to work around his apartment, depending on his mood. (*Id.*) He might take a walk. (*Id.*) Wenburg would go down to the post office, and if he was downtown, run any errands he had there, and sometimes walk around just for exercise. (*Id.*) He would also see if his mother was home and needed any help. (*Id.*) Wenburg estimated that on a typical day, he spent about 70 percent of his time in his apartment. (Tr. 41.)

In describing his physical condition, Wenburg testified that he was diagnosed with diabetes when he was 13, and that his diabetes was under "[p]retty good" control. (Tr. 37–38, 43.) He stated that other than his feet, he was not having any problems with his diabetes. (Tr. 38.) Wenburg explained that he could not stand for very long hunched over, or his back would begin to ache. (*Id.*) Other than the occasional Tylenol, he was not taking any medications for back pain. (Tr. 39.) Wenburg testified he could carry 10 to 25 pounds, sit without problems depending on the type of chair, stand for 30 minutes or longer without any back problems, and that he had no problems walking. (*Id.*)

Before his right great toe was amputated, the problems with Wenburg's right foot led to swelling and intense pain in his right leg, which remained painful even when he was sitting or lying down. (Tr. 46–47.) Before this treatment, he also experienced other sores on his feet that would open up while he was working. (Tr. 45.) Wenburg reported that he also used to have occasional swelling in his left foot, but did not attribute this to his diabetes. (Tr. 46.) At the hearing, he testified that he no longer had any pain in his feet or problems with his legs. (Tr. 47.)

Wenburg also described his mental condition, reporting that he was diagnosed with depression in his mid-30s and with Asperger's syndrome in 2007. (Tr. 43.) He stated that due to his Asperger's syndrome, he would become interested in collecting items, and then collect them excessively, causing a lot of clutter. (*Id.*) Wenburg explained that he did not know how to be around people and have fun, and that when he goes out he just sits alone. (*Id.*) He testified that he had problems with depression, and that he had been seeing a mental health therapist, Lorna Lawton, once every week, for the past 6 to 7 years. (Tr. 47.) Wenburg claimed that he had "a lot of problems at

10

work, just dealing with people, just feeling like I fit in," and that at one point he felt "cursed" and that he would have been better off if he had not come out of a diabetic coma. (Tr. 47–48.) He expressed concern about his lack of job skills and taking care of his diabetes in the future. (Tr. 48.)

Wenburg reported that although he did not sleep well at night, he did not have trouble concentrating on simple things such as watching television, and was able to manage his own finances. (Tr. 39–40, 48–49.) But he also explained that he had problems getting along with other people, he did not socialize well, that his problems with people were worse in larger groups, and that loud noises, being yelled at, and frustration caused him to be anxious. (Tr. 40.) He admitted that his medications helped him with his depression and anxiety, and getting to sleep. (Tr. 40–41.)

Wenburg testified that he could be on his feet 2 to 3 hours out of an 8-hour day. (Tr. 48.) He claimed that if he does not move around enough to get his circulation going, he feels stinging, pain in his feet and back, and the pain lingers and becomes worse, causing him additional stress, anxiety, and depression. (Tr. 48.)

Wenburg also stated that because of his mental health issues, he worked with a community support worker, Lissette Acosta, of Goodwill. (Tr. 49.) She helped him with socializing, and also made sure that Wenburg visited his therapist, made necessary medical appointments, took care of himself and his home, and took his medications. (Tr. 49.) When asked, "Do you need all this assistance?" he replied "It helps[,] so I say yes." (Tr. 49–50.)

## 2.      Testimony of Lissette Acosta

The ALJ next received testimony from Lissette Acosta. Acosta explained that as a community support worker with Goodwill, she works with people diagnosed with mental illnesses and helps them to find health care providers, budget money, find medical assistance, and set goals for their personal and home care. (Tr. 51.) Acosta stated that Wenburg had been receiving help from Goodwill for 2 to 3 years and that she had been working with him for 5 to 7 months. (Tr. 51.) She testified that he had trouble keeping his home clean and maintaining the standards necessary to live in an apartment managed by the local housing authority. (Tr. 52.) Acosta helped Wenburg try to gain coping skills for his symptoms and social skills. (*Id.*) She explained that he was unable to work well with others and tended to isolate himself. (*Id.*) She sometimes helped him with transportation to go grocery shopping. (*Id.*) Acosta opined that, if Wenburg was discharged from the program, he might function well for a little while, but after a few months, he would become increasingly depressed and isolated. (Tr. 53.) She testified that he would then forget to take care of himself and visit his doctors and

therapist. (Tr. 53.) Acosta believed that without her assistance, Wenburg would have "substantial difficulty" in his activities of daily living. (Tr. 53.)

**3.     Testimony of Vocational Expert Judith Najarian**

Finally, the ALJ heard the testimony of Vocational Expert (VE) Judith Najarian. Najarian testified in response to several hypothetical questions posed by the ALJ, which outlined Wenburg's age, education, work experience, and work-related limitations (Tr. 55–57.) First, the ALJ asked Najarian to consider a hypothetical individual who could lift and carry 25 pounds occasionally and 10 pounds frequently, who could sit, stand, or walk for 6 hours during an 8-hour workday, and who had to avoid wet conditions. (Tr. 56.) Najarian testified that although the individual could not perform Wenburg's past work, there was other work in the light, unskilled labor market that an individual with those limitations could perform. (*Id.*) She provided representative occupations of ticket taker, library page, and price marker. (Tr. 56–57.)

For the second hypothetical, the ALJ added that the individual was restricted to "simple routine tasks and occasional public contact." (Tr. 57.) Najarian stated that the individual would not be able to perform the ticket taker occupation, but could still work as a library page, price marker, or bottle packer. (*Id.*) Najarian also testified regarding the availability of all the jobs she identified in the area of Nebraska, Iowa, Kansas, and Missouri, as well as the United States as a whole. (Tr. 56–57.)

For the last hypothetical, the ALJ added that the individual would need frequent supervision. (Tr. 57.) Najarian testified that there would be no jobs available for such a person. (Tr. 57–58.)

The ALJ's decision will be discussed in detail below, in conjunction with the procedures governing the ALJ's decisionmaking process. Briefly, the ALJ found that although Wenburg suffered from several severe impairments, including depression, anxiety, and Asperger's syndrome, he had the RFC to perform other jobs that exist in significant numbers in the national economy. (Tr. 15–23.) Specifically, the ALJ found that Wenburg had the RFC to lift or carry 25 pounds occasionally and 10 pounds frequently and sit, stand, or walk for 6 hours during an 8-hour workday. (Tr. 17.) The ALJ also determined that Wenburg needed to avoid wet environments. (Tr. 17.) Finally, Wenburg's RFC included limitations to simple, routine tasks and occasional contact with the public. (Tr. 17.)

## III. STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing

42 U.S.C. § 405(g). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. _Id._ The Court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. _Perkins v. Astrue_, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. _Id._

The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. _Buckner v. Astrue_, 646 F.3d 549, 559 (8th Cir. 2011).

The Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence. _Boettcher v. Astrue_, 652 F.3d 860, 863 (8th Cir. 2011).

## IV. ANALYSIS

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4). At the first step, the claimant has the burden to establish that he has not engaged in substantial gainful activity since his alleged disability onset date. § 404.1520(a)(4)(i); _Gonzales v. Barnhart_, 465 F.3d 890, 894 (8th Cir. 2006). If the claimant has engaged in substantial gainful activity, the claimant will be found not to be disabled; otherwise, the analysis proceeds to step two. § 404.1520(a)(4)(i); _Gonzales_, 465 F.3d at 894. At the second step, the claimant has the burden to prove he has a "medically determinable physical or mental impairment" or combination of impairments that is "severe", § 404.1520(a)(4)(ii), in that it "significantly limits his physical or mental ability to perform basic work activities." _Gonzales_, 465 F.3d at 894; _see, also,_ _Kirby v. Astrue_, 500 F.3d 705, 707–08 (8th Cir. 2007). Next, "at the third step, [if] the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits." _Gonzales_, 465 F.3d at 894; § 404.1520(a)(4)(iii). Otherwise, the analysis proceeds.

Before moving to step four, the ALJ must determine the claimant's RFC, which is then used at steps four and five. § 404.1520(a)(4). "'Residual functional capacity' is defined as 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable

13

impairments,' including those not found to be 'severe.'" *Gonzales*, 465 F.3d at 894 n.3 (quoting 20 C.F.R. § 404.1545, 416.945).

At step four, the claimant has the burden to prove that he lacks the RFC to perform his past relevant work. § 404.1520(a)(4)(iv); *Gonzales*, 465 F.3d at 894. If the claimant can still do his past relevant work, he will be found to be not disabled, otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform. *Gonzales*, 465 F.3d at 894; § 404.1520(a)(4)(v).

## A.   The ALJ's Decision

Wenburg claims the ALJ erred by (1) failing to include in her hypotheticals to the VE the impact of claimant's "moderate difficulties relating to concentration, persistence[,] and pace" and (2) failing to "orient the VE to the totality of [Wenburg's] limitations." Filing 16, at 3–4. Wenburg claims that as a result of these errors, the ALJ's decision was not supported by substantial evidence. The only argument that Wenburg actually puts forward in his brief relates to step five of the ALJ's analysis.[10] The Court has reviewed the entirety of the ALJ's decision. For the following reasons, the Court finds that the decision was made in accordance with the correct procedures and is supported by substantial evidence.

## 1.   The ALJ's Step One Determination

As a preliminary matter, the ALJ found that claimant met the insured status requirements of the Social Security Act through December 31, 2012. (Tr. 15.) At step one, the ALJ found that Wenburg had not engaged in substantial gainful activity since June 24, 2008, his alleged onset date. (Tr. 15); 20 C.F.R. § 404.1571.

## 2.   The Procedures for Deciding Steps Two and Three

For mental impairments, at steps two and three of the sequential analysis, the ALJ utilizes a two-part "special technique" to evaluate a claimant's impairments and determine, at step two, whether they are severe,

---

[10] Wenburg's second assignment of error is never discussed in his brief. The alleged "failure of the ALJ to orient the VE to the totality of claimant's limitations" is simply a consequence of the ALJ's alleged failure to provide the correct hypotheticals. The Court reads this not as an independent assignment of error, but rather as a description of how the first error prejudiced Wenburg. *See O'Connor-Spinner v. Astrue, 627 F.3d 614, 621 (7th Cir. 2010)* (concluding that by providing an incomplete hypothetical, "the ALJ failed to direct the VE to the totality of [the claimant's] limitations," thus leaving the ALJ's step five determination unsupported by substantial evidence).

and if so, at step three, whether they meet or are equivalent to a "listed mental disorder." § 404.1520a(a), (d)(1) and (2).

The special technique first requires the ALJ to determine whether the claimant has "medically determinable mental impairment(s)." § 404.1520a(b)(1). If any such impairment exists, the ALJ must then rate the degree of "functional limitation" resulting from the impairment. § 404.1520a(b)(2). This assessment is a "complex and highly individualized process that requires [the ALJ] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." § 404.1520a(c)(1).

Four "broad functional areas' are used to rate these limitations "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." § 404.1520a(c)(3). These functional areas are also referred to as the "paragraph B criteria," which are contained in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 et seq. The first of the three paragraph B criteria are rated using a five-point scale of none, mild, moderate, marked, and extreme. § 404.1520a(c)(4). The fourth criterion, episodes of decompensation, is rated as: none, one or two, three, four or more. *Id.*

After rating the degree of functional limitation resulting from any impairments, the ALJ determines the severity of those impairments (step two). § 404.1520a(d). Generally, if the first three functional areas are rated as "none" or "mild" and the fourth area as "none," the ALJ will conclude that any impairments are not severe, unless the evidence indicates otherwise. § 404.1520a(d)(1). If any impairments are found to be severe at step two, the ALJ proceeds to step three, and compares the medical findings about the impairments and the functional limitation ratings with the criteria listed for each type of mental disorder in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 et seq.

3.    **Steps Two and Three in the Present Case**

At step two, the ALJ determined that Wenburg suffered from the following severe impairments: "diabetes mellitus, status-post right great toe amputation, status-post hip fracture; depression, anxiety; and Asperger's syndrome." (Tr. 15); 20 C.F.R. § 404.1520(c). At step three, the ALJ found that Wenburg's impairments, singly and in combination, did not meet or medically equal a listed impairment. (Tr. 16); 20 C.F.R. Part 404, Subpart P, Appx. 1; 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

The ALJ considered Wenburg's mental impairments singly and in combination, under the listing criteria for affective disorders, anxiety-related disorders, and autistic disorders. (Tr. 16); 20 C.F.R. Part 404, Subpart P, Appx. 1 §§ 12.04, .06, .10. To satisfy the paragraph B criteria for each of these

15

listings, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, Appx. 1 §§ 12.04, .06, .10.

The ALJ found as follows. Wenburg had only a mild restriction in activities of daily living, based on his testimony that he could take care of his personal hygiene, do household chores, cook, and shop. (Tr. 16.) Wenburg had moderate difficulties in social functioning. The ALJ noted that he visited his mother and used to be involved in martial arts practice, which he gave up due to a hip fracture. (*Id.*) The ALJ acknowledged Wenburg's testimony that he had difficulty interacting with others and felt socially awkward. (*Id.*)

The ALJ found that Wenburg had moderate difficulties in "concentration, persistence, or pace." (Tr. 16–17.) This determination took into account Wenburg's testimony that he could concentrate on television, manage his own finances, and that he collected music and movies. (Tr. 16–17.) It also reflected Shundoff's opinion that Wenburg was limited to simple, repetitive tasks. (Tr. 16–17.) Finally, the ALJ found that Wenburg had experienced one to two episodes of decompensation, each of an extended duration, noting that he had been hospitalized twice, including once post-onset date. (Tr. 17.) The ALJ concluded that these limitations did not meet the criteria of either paragraph B or paragraph C. (Tr. 17); *see* 20 C.F.R. Part 404, Subpart P, Appx. 1 § 12.00(A). Wenburg has not objected to these findings.

The ALJ also determined that Wenburg's physical impairments did not meet the criteria for any listed impairments in 20 C.F.R. Part 404 Subpart P., Appx. 1, §§ 1.00 *et al.* (disorders of the musculoskeletal system) and 9.08 (diabetes mellitus). (Tr. 16.)

## 4.    The Procedure for Determining a Claimant's RFC

To determine a claimant's RFC, the ALJ must consider the impact of *all* the claimant's medically determinable impairments, even those previously found to not be severe, and their related symptoms, including pain. §§ 404.1529(d)(4); 404.1545(a)(1–2). This requires a review of "all relevant evidence" in the case record. § 404.1545(a). Although the ALJ is responsible for developing the claimant's complete medical history, § 404.1545(a)(3), the claimant bears the burden of proof to demonstrate his or her RFC. *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000).

The ALJ will consider "statements about what [the claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations," as well as descriptions and observations of

16

the claimant's limitations caused by his impairments, including limitations resulting from symptoms, provided by the claimant or other persons. § 404.1545(a)(3).

The RFC assesses the claimant's ability to meet the physical, mental, sensory, and other requirements of work. § 404.1545(a)(4). The mental requirements of work include, *inter alia*, the ability: to understand, remember, and carry out instructions; to respond appropriately to supervision, coworkers, and work pressures in a work setting; to use judgment in making work-related decisions; and to deal with changes in a routine work setting. §§ 404.1545(c); 404.1569a(c); *Social Security Ruling (SSR) 96-8p: Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*. *All* limits on work-related activities resulting from a claimant's mental impairments must be described in the mental RFC assessment. *SSR 85-16: Titles II and XVI: Residual Functional Capacity for Mental Impairments*.

As alluded to above, a special procedure governs how the ALJ evaluates a claimant's symptoms. The ALJ first considers whether the claimant suffers from a "medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms." § 404.1529(c)(1); (a)–(b). The medically determinable impairment(s) must be demonstrated by medical signs or laboratory evidence. § 404.1529(b). If this step is satisfied, the ALJ then evaluates the intensity and persistence of the claimant's symptoms to determine how they limit the claimant's ability to work. § 404.1529(c)(1). This again requires the ALJ to review all available evidence, including statements by the claimant, "objective medical evidence,"[11] and "other evidence."[12] § 404.1529(c)(1)–(3).

The ALJ considers the claimant's statements about "the intensity, persistence, and limiting effects of [his] symptoms," and evaluates them "in relation to the objective medical evidence and other evidence." § 404.1529(c)(4). Ultimately, symptoms will be determined to diminish the claimant's capacity for basic work activities, and thus impact the claimant's RFC, "to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*; § 404.1529(d)(4).

---

[11] §§ 404.1529(c)(2); .1528(b) and (c).

[12] "Other evidence" includes information provided by the claimant, treating and non-treating sources, and other persons. See § 404.1529(a)(1), and the sections referred to therein, as well as § 404.1529(c)(3).

In assessing the credibility of a claimant's subjective testimony regarding his or her alleged symptoms, the ALJ must weigh a number of factors. *See, Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009); § 404.1529(c)(3)(i–vii).[13] When deciding how much weight to afford the opinions of treating sources and other medical opinions regarding a claimant's impairments or symptoms, the ALJ considers a number of factors set forth in § 404.1527.

## 5.   The ALJ's Determination of Wenburg's RFC

The ALJ found that Wenburg had the physical RFC to lift or carry 25 pounds occasionally and 10 pounds frequently and to sit, stand, or walk 6 hours in an 8-hour workday; and found that he must avoid wet environments. (Tr. 17.) Wenburg's mental RFC limited him to "simple routine tasks and occasional contact with the public." (Tr. 17.) After discussing Wenburg's physical and mental impairments, and the related medical history, the ALJ considered the opinion of his treating therapist, Lorna Lawton, a Licensed Mental Health Practitioner. (Tr. 17–18.) The ALJ noted that Lawton had seen Wenburg for 6 years and that Lawton reported that Wenburg cuts himself when depressed and anxious. (Tr. 18.) Lawton had also opined that Wenburg was not able to work around others due to his anxiety, and that he was not able to be around others. (Tr. 18.) The ALJ afforded Lawton's opinion "little weight," finding that it was not supported by the evidence overall. (Tr. 18.) The ALJ reasoned that the treating records did not document any history of self-mutilation, and that Lawton's opinions overstated Wenburg's limitations. (Tr. 18.) Additionally, Lawton was not an "acceptable medical source for purposes of giving a medical opinion or establishing the existence of a medically determinable mental or physical impairment." (Tr. 18, *citing* 20 C.F.R. §§ 404.1513(a), .1527(a)(2).)

The ALJ next reviewed Wenburg's consultative psychological examination with Dr. Sheryl Shundoff. (Tr. 18.) The ALJ gave "some weight" to Shundoff's opinion. (*Id.*) Shundoff diagnosed Wenburg with recurrent major depression and ruled out personality disorder, and assessed his GAF as 40. (*Id.*) Shundoff's opined that Wenburg "could perform simple repetitive tasks unless under stress and had difficulty interacting with others." (*Id.*) The ALJ noted that even though Shundoff reported a GAF score lower than

---

[13] In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Moore*, 572 F.3d at 524.

that generally reported in Wenburg's medical records, Shundoff still believed that he could perform simple repetitive tasks and have limited contact with others in the workplace. (*Id.*)

The ALJ next considered the opinions of the state agency medical consultants who provided RFC assessments at the initial and reconsideration levels. (Tr. 18–19.) The ALJ afforded their *physical* RFC assessments "great weight," even though they did not examine Wenburg, because they provided specific reasons for their opinions about the claimant's RFC, which demonstrated their opinions were grounded in the evidence of the case. (Tr. 18–19.)

The ALJ afforded the consultants' *mental* RFC assessments "some weight" to the extent supported by the evidence overall. (Tr. 19.) The consultants reported that Wenburg was "moderately limited in his ability to work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriate [sic] with the public; and respond appropriately to changes in the work setting." (Tr. 19.) The ALJ took Wenburg's moderate difficulties in social functioning into account in assessing Wenburg's RFC. (Tr. 16.)

The ALJ evaluated the credibility of Wenburg, the other witnesses, and the medical sources, using the appropriate standards.[14] (Tr. 19.) The opinion discussed and applied the two-step process for evaluating the impact of Wenburg's symptoms on his RFC. (Tr.19–21.) The ALJ reviewed Wenburg's testimony (Tr. 19–20), the testimony of Lissette Acosta (Tr. 20), and the relevant medical records. (Tr. 21.)

The ALJ concluded that Wenburg's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 20.) However, Wenburg's statements regarding the intensity, persistence, and limiting effects of these symptoms were not fully credible to the extent they were inconsistent with the RFC assessment. (Tr. 20.)

The ALJ reasoned that Wenburg's allegations as to the extent of his limitations were not supported by the record. (Tr. 21.) His testimony regarding his ability to perform a variety of activities of daily living was "inconsistent with his allegations of incapacitating impairments." (*Id.*) By August 2008, Wenburg wanted to return to work but was unable to find a job, and in April 2009, he completed a job application for seasonal park work. (*Id.*) A review of the medical records revealed that they "rarely mention[ed] depression and anxiety." (*Id.*) Although Wenburg reported feeling depressed

---

[14] See *supra* note 13, and accompanying text.

and having difficulty sleeping when he was hospitalized in August 2009 for 1 week, his condition quickly improved once his medications were adjusted. (*Id.*)

The ALJ agreed that Wenburg was socially awkward, but stated that his diagnosis of Asperger's had been made by a therapist at Lutheran Family Services. (Tr. 18, 21.) The ALJ also observed that he was able to complete 2 years of college. (*Id.*)

The ALJ acknowledged that Wenburg's community support worker, Lissette Acosta, testified that Wenburg would not do well without support. (*Id.*) However, Wenburg had managed to live on his own for many years before his services with Goodwill started. (*Id.*) The ALJ therefore gave Acosta's opinion little weight, adding that Acosta was a social worker, and not a Ph.D. or M.D. (*Id.*) Finally, the ALJ stated that the evidence did "not support [Wenburg's] allegations of totally incapacitating symptoms," and that the RFC assessment included all of the limitations supported by the record. (*Id.*)

## 6.    The ALJ's Determinations at Steps Four and Five

Based on the RFC and the testimony of the VE, the ALJ concluded that Wenburg was unable to perform his past relevant work. (Tr. 21.) Based on the hypotheticals and testimony of the VE, the ALJ concluded that Wenburg, given his RFC, age, education, and work experience, could perform jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1569a. Therefore, Wenburg was found not to be disabled within the meaning of the Social Security Act, and was ineligible for benefits. (Tr. 22–23.)

## B.    The ALJ's Hypotheticals to the Vocational Expert

Wenburg argues that the ALJ erred by not including in the hypotheticals the "impact of [Wenburg's] moderate difficulties relating to concentration, persistence, and pace." Filing 16, at 3. The Court finds no merit in this assignment of error.

A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant. *Howard v. Massanari*, 255 F.3d 577, 581–82 (8th Cir. 2001). Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies. *Cox v. Astrue*, 495 F.3d 614, 620 (8th Cir. 2007). However, a hypothetical must include only those impairments and limitations that are supported by the record, which the ALJ accepts as valid, and which the ALJ finds to be credible. *Gragg v. Astrue*, 615 F.3d 932, 940 (8th Cir. 2010); *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000).

20

The Court reviews an ALJ's hypotheticals for substance over form. While the hypothetical question must set forth all the claimant's impairments, it need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments. *Howard*, 255 F.3d at 582. In other words, the ALJ need only provide the VE with an accurate assessment of what the claimant "'can and cannot do.'" *Webb v. Commissioner of Social Sec.*, 368 F.3d 629, 633 (6th Cir. 2004).

Wenburg relies on *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010), and the cases cited therein, for the proposition that "[i]n most cases . . . employing terms like 'simple, repetitive tasks' . . . [in the hypothetical] will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace."[15]

Wenburg's reliance on *O'Connor-Spinner* is misplaced. First, in *O'Connor-Spinner*, the ALJ explicitly determined that the claimant's *RFC* included moderate limitations in concentration, persistence, and pace. *Id.* at 617–18. By contrast, while the ALJ in the present case found moderate limitations in concentration, persistence, or pace at *step two*, these generic limitations were not part of Wenburg's ultimate RFC. There are important distinctions between a step two determination of severity and the separate determination of a claimant's RFC. The step two determination looks to the "broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments," *SSR 96-8p*, i.e., "activities of daily living," "social functioning," "concentration, persistence, or pace," and "episodes of decompensation." 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00(C)(1)–(4). The RFC determination, on the other hand, requires a more detailed assessment that specifically itemizes the broad paragraph B categories, *SSR 96-8p*, such as the abilities to understand, remember, and carry out instructions; to respond appropriately to supervision, coworkers, and work pressures in a work setting; to use judgment in making work-related decisions; and to deal with changes in a routine work setting. §§ 404.1545(c); 404.1569a(c); *SSR 96-8p*.

In the present case, the ALJ determined at step two that Wenburg had moderate difficulties in concentration, persistence, or pace. (Tr. 16.) "Concentration, persistence, or pace refers to the ability to sustain focused

---

[15] Wenburg and the *O'Connor-Spinner* court both refer to "concentration, persistence, *and* pace." Filing 16, at 3; *O'Connor-Spinner*, 627 F.3d at 618 (emphasis supplied). However, the Social Security Administration's regulations always refer to "concentration, persistence, *or* pace." 20 C.F.R. Part 404, Subpart P, Appx. 1 § 12.00(C) (emphasis supplied).

attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00(C)(3). In formulating Wenburg's RFC, the ALJ found more specifically that Wenburg had the ability to do simple, routine tasks, and could have limited contact with the public. (Tr. 17.)

The ALJ included all of the limits from this RFC in the hypotheticals to the VE. Under Eighth Circuit precedent, the ALJ's hypotheticals were therefore sufficient, provided the RFC determination was supported by substantial evidence and captured the concrete consequences of Wenburg's impairments. _Cox_, 495 F.3d at 620. In _Howard_, the claimant argued that the ALJ erred by not adequately presenting his deficiencies in concentration, persistence, or pace in the hypotheticals to the VE. _Howard_, 255 F.3d at 581. The ALJ's hypothetical asked the VE to assume that the individual would be capable of "simple, routine, repetitive tasks." _Id._ The state agency psychological consultant had found that Howard "often"[16] had deficiencies in concentration, persistence, or pace. _Id._ at 582. However, the same consultant opined that Howard was "'able to sustain sufficient concentration and attention to perform at least simple, repetitive, and routine cognitive activity without severe restriction of function.'" _Id._ Based on this evidence, the court held that the ALJ's hypothetical adequately captured the concrete consequences of the claimant's deficiencies in concentration, persistence, or pace. _Id._

The key question thus becomes whether the ALJ's RFC determination captured the concrete consequences of Wenburg's limitations (that were supported by the record and that the ALJ found credible). Wenburg, however, has not claimed that the ALJ erred in determining his RFC, or in the underlying determinations of his credibility or the weight to afford the opinions of the various sources and witnesses. Nor has Wenburg suggested what, if any, "concrete consequences" of his impairments were left out of the hypotheticals.

The Court has nevertheless reviewed the record and is satisfied that the ALJ's RFC determination was supported by substantial evidence. Therefore, following the reasoning of _Howard_, the ALJ's hypotheticals were sufficient to orient the VE to the totality of Wenburg's limitations.

## C.    The ALJ's Determination of Wenburg's RFC

---

[16] Limitations in concentration, persistence, or pace used to be rated as "never, seldom, often, frequent, and constant." 20 C.F.R. § 404.1520a(b)(3) (2000). "Often" and "moderate" both fall in the mid-point of their corresponding five-point scales. _Compare_ § 404.1520a(c)(4) (2011) _with_ § 404.1520a(b)(3) (2000).

An RFC must assess the claimant's ability to meet the mental requirements of work, § 404.1545(a)(4), which includes the ability to respond appropriately to coworkers and work pressures. §§ 404.1545(c); 404.1569a(c); SSR 96-8p. The RFC must include *all* limits on work-related activities resulting from a claimant's mental impairments. SSR 85-16.

In determining Wenburg's mental RFC, the ALJ relied primarily upon the consultative examination of Shundoff and the reports of the state agency medical consultants. (Tr. 18–19.) The ALJ afforded each "some weight" to the extent supported by the evidence overall. (*Id.*) Taken together, the reports of the Shundoff and the consultants support a finding that although Wenburg had moderate limitations in "concentration, persistence, or pace," he retained the ability to perform simple, routine tasks.

The state agency consultants opined that Wenburg was moderately limited in his ability "to work in coordination with or proximity to others without being distracted by them," and "to complete a normal workday and workweek without interruptions from psychologically based symptoms." (Tr. 410–11.) They also noted that Wenburg was moderately limited in his ability to interact appropriately with the general public. (Tr. 411.)

Despite these limits, the same consultants found that Wenburg had no significant limits in his ability to understand and carry out very short and simple instructions; to remember locations and work-like procedures; or in his ability to understand and remember very short and simple instructions. (Tr. 410.) They observed no evidence of limitation in his ability to understand and remember detailed instructions. (*Id.*)

Similarly, Shundoff reported that Wenburg had "difficulties in maintaining social functioning," and that he could not "relate appropriately to co-workers and supervisors," noting that he did "so-so" with supervisors, but felt he could not please them. (Tr. 407) Shundoff did not specifically address his ability to relate to coworkers, but simply noted that he was not interacting with them at that time, and that most of them did not speak English. (*Id.*) Shundoff also observed that Wenburg had suffered from recurrent episodes of deterioration when stressed which resulted in him withdrawing or a worsening of his symptoms. (Tr. 407.) She noted that when stressed, Wenburg could not function at work and would have suicidal thoughts. (*Id.*)

Nevertheless, Shundoff concluded that Wenburg had the ability to: "sustain [the] concentration and attention needed for task completion," although he had an easier time functioning at home than at work; "to understand and remember short and simple instructions;" and "to carry out short and simple instructions under ordinary supervision," unless he was under stress. (Tr. 407.)

The ALJ adequately encapsulated these findings in the RFC assessment, which limited Wenburg to simple, routine tasks and occasional contact with the public. The ALJ found that, even if Wenburg's mental impairments led him to experience stress or distraction at work, any resulting difficulties in concentration, persistence, or pace, would not keep him from performing simple, routine tasks. The opinions of Shundoff and the consultants provided substantial evidence for this determination.

It is true that other evidence in the record speaks to greater limitations on Wenburg's abilities to function in a work environment. For example, Wenburg's therapist, Lorna Lawton, opined that Wenburg was "*not able* to work around others, due to his anxiety." (Tr. 462) (emphasis supplied). However, even if some evidence points the other way, the opinions of Shundoff and the consultants provided substantial evidence for the ALJ's RFC assessment. Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Teague*, 638 F.3d at 614 (citing 42 U.S.C. § 405(g)).

## V. CONCLUSION

The Court has reviewed the administrative record and finds that the ALJ did not err in determining Wenburg's RFC or in forming the hypotheticals to the vocational expert. The Court therefore concludes that the Commissioner's decision was supported by substantial evidence and should be affirmed.

Accordingly,

IT IS ORDERED:

1.     The Commissioner's decision is affirmed;
2.     The parties shall bear their own costs; and
3.     A separate Judgment will be entered.

Dated this 9th day of May, 2012.


BY THE COURT:

_John M. Gerrard_

John M. Gerrard
United States District Judge

24